Case number 23-1667, United States of America v. Duane Underwood II, Oral Argument Not to Exceed, 15 minutes per side. Mary Chartier for the appellant, you may proceed. Thank you. Good morning. Good morning, Your Honors. May it please the Court, Mary Chartier on behalf of Duane Underwood. With the Court's permission, I would like to request two minutes for rebuttal. Very well. Thank you. Mr. Underwood's conviction should be reversed for the reasons that we articulated in our brief. Today, I would like to focus on the unconstitutional stop in search of Mr. Underwood, as well as a few issues that arose during trial. But of course, I'm happy to answer questions on any of the issues raised. Mr. Underwood was unconstitutionally seized on the street when the police had absolutely no reasonable suspicion to do so. It was a hunch at best when he was stopped. That ultimately led to the search of Mr. Underwood, and the fourth pat-down of Mr. Underwood was when methamphetamine was found in his back pocket. Significantly, he was searched three times prior to that fourth search, and the pink firearm, which is the reason that the police were in the neighborhood to begin with, had already been retrieved, and it had been retrieved approximately four minutes before. When Mr. Underwood was searched, he was initially searched, and his front pockets were searched by the police. Then approximately 30 seconds later, his waistband was patted down. Then his pockets were searched again at approximately one minute and 50 seconds. At two minutes... Is that all different searches? There were other people with weapons at the scene. Is that an interrupted search? An incomplete? If you touch the front pockets because there's a bulge and it's cash, and then you request someone sit down while you attend to a gun, tell me what your view is of whether that's a continuation, an interruption, or a new search, and is it not of a different area? It's a new search. In viewing the video and kind of looking contextually at everything that was know that the court knows the facts of the case, but essentially a gentleman reported that his stepson had a firearm. That's Mr. Van Pelt, who did not testify at trial. Mr. Van Pelt was stopped walking down the street. Mr. Underwood was walking near him, and there were three gentlemen in the car. Mr. Jones was the individual who had the pink firearm and actually had fired it, accidentally it appears, and then was seen by the police putting it outside of the car. Mr. Shears was in the driver's seat. Mr. Bible was in the front seat, and why that's important is when the pink firearm is obtained, it's roughly at two minutes and 37 seconds in the video. Mr. Underwood had been searched three times prior. Even if it were... Is it your position that once the search began, all areas that were to be had to be accomplished at that time? Well, at that time, the officer is essentially searching because there's a concern that the individual would be armed and dangerous, and so if the officer's belief is that Mr. Underwood is armed and dangerous, the officer would complete the search. The officer, if the concern is genuine, and we don't believe that there is a genuine concern about Mr. Underwood because he is seen walking down the street and merely being in the presence of other people who may have firearms, is not enough to stop someone on the street and search them. But even if the court believes that that initial stop where he's walking down the street near Mr. Van Pelt is justified, once the firearm is obtained and once Mr. Underwood is searched, whether it's three times as we articulate or whether the court believes it's one continuous search that is interrupted where his pockets and his waistband and then his pockets again are Once that firearm is obtained, there's no specific and articulable reason that Mr. Underwood himself would be armed and dangerous. And in fact, even if that pink firearm had not been obtained, there's no specific and articulable reason that Mr. Underwood would be the individual who is armed and dangerous. Mr. Van Pelt, quite possibly, because that's who his stepfather is referencing who has the pink firearm, but not Mr. Underwood. And then it is only at six minutes and 11 seconds where the officer asks Mr. Underwood if he can search him. Will he consent? Mr. Underwood says no. And then the officer searches him anyway. And that's when he finds a methamphetamine in the back pocket, which we believe also he lingered on that pocket. And so it certainly was not apparent that it was drugs within a baggie. But regardless, whether it's one search at the beginning or three searches, that interruption from one minute and 50 seconds to six minutes and 11 seconds. So at one minute and 50 seconds, that's the last search of Mr. Underwood. So whether, again, there's one or three, there are three separate pat downs, whether it's one continuous one or one. And then... Make a difference to your argument if the initial pat down began, and then he was seated on the ground in handcuffs so that if he had a weapon somewhere else, he could not use it while a police officer goes and attends to another person or another individuals that are said to have had firearms. Respectfully, I have been doing this a long time. I handled a lot of cases. If law enforcement is concerned that an individual has a weapon, I have never seen them walk away. I think that that is not credible in the context of what happened here in terms of what law enforcement's concern was. Law enforcement's initial concern was that pink so two individuals, other individuals in the car had firearms. Again, irrespective of Mr. Underwood. But if they were concerned that Mr. Underwood had a firearm, they would not leave Mr. Underwood alone, whether he's handcuffed or not. We all know individuals can get out of handcuffs. They can manipulate themselves to reach a firearm. Nothing to say that with hands handcuffed, you can't reach back and get it. If your hands are handcuffed behind, you can certainly obtain a weapon then as well. So the concern about the specific and articulable concern about Mr. Underwood having a weapon is belied by what's happening on the scene. And that roughly four minutes in between when it is found and then when Mr. Underwood is searched. And the seizure of Mr. Underwood were unconstitutional. And that sets off how he ultimately gets charged. If Mr. Underwood had not been unconstitutionally seized and then unconstitutionally searched, he likely would not have been charged at all. Because on that day, the pink firearm is linked to Mr. Van Pelt and Mr. Jones. Mr. Jones again is the individual who has the firearm and is seen putting it on the ground outside of the car. And then he's also linked to the methamphetamine in the backseat of the car. And Mr. Underwood, the only link with Mr. Underwood at that time is the methamphetamine that is found in his pocket. Significantly, the methamphetamine found in his pocket, the purity of that does not match the purity of the methamphetamine that is found in the backseat of the car. The purity of that methamphetamine actually matches what is found. I believe it's 1.5 grams that is found in the pocket of Mr. Bible, who's the front seat passenger. That is significant. There were no cutting agents found at the scene, no cutting agents found in the back. So the significance of the methamphetamine found in Mr. Underwood's pocket cannot be overstated because that is what starts this ball rolling. And essentially, he's linked to this firearm and then he is linked to the methamphetamine in the backseat. Although on the day in question, he's not linked to that at all. What ultimately, allegedly links Mr. Underwood to the pink firearm is the testimony at the grand jury of Mr. Chapman. And that is issue eight. Mr. Chapman was Mr. Van Pelt's stepfather. He speaks to the police on the day in question, July 9th, 2019. And he articulates his concerns about his stepson, Mr. Van Pelt. And then he also speaks to the police the next day. And he again articulates his concerns about his stepson, Mr. Van Pelt. On none of those occasions does he ever mention the name of Mr. Underwood, Mr. Underwood's nickname of Junior. He never mentioned seeing Mr. Underwood with the gun, not at all. If his concern is truly this firearm, he would articulate that he saw Mr. Underwood with it. He would articulate that Mr. Van Pelt had the firearm and now it was in the hands of Mr. Underwood. He never says anything despite having numerous contact that he initiates initially with the police. The only link between Mr. Underwood and this pink firearm is what Mr. Chapman says at the grand jury. And at the grand jury, he articulates that he saw Mr. Underwood with the firearm. But when he gets to trial, he does not state that. He says that he saw Mr. Underwood walking down the street, but he did not see Mr. Underwood with a firearm. He said he saw something pink and gray, but he couldn't say that it was a firearm. And that's significant. Before we go further on that, I would like you to address your argument that there's no historical analog for Section 924C1A. Sure. So the... The question is, is there a right? Right. Sure. And then the question is, was the right abridged? So I would like you to begin with whether there's a right. There is a right, and that right was abridged. So in looking at the dates, the Second Amendment is established, we know, in the 1700s, late 1700s. The domestic distribution of drugs is enacted in 1914 under the Harrison Narcotic Act. But then 924C is not enacted until 1968. So if we look at, is there a historical right to possess a firearm? There is. We know that. This court knows that very well. Is there a historical right to possess a firearm even if someone is distributing drugs? There is. It is only well into the 20th century, in 1968, that Congress then says you cannot possess a firearm if it's in furtherance of drug distribution. Then the question becomes whether the right itself is a right to possess arms for self-defense or other lawful purposes. Help me, I'm struggling a little bit with the historical analog here because we know Heller said that the court said that the right to bear arms is only for lawful purposes. And we know that at the time of the founding, there was no right to commit crimes with weapons because we see the historical analog has to do with laws at that time period that enhanced penalties if you did an act, say burglary, with the carrying of a weapon. Doesn't that limit what the historical analog is to carrying the weapon for the right of lawful purposes? Respectfully, no, because if that were the historical underpinning of the Second Amendment, then all the iterations of Congress passing laws, and we know there are thousands of them, some of them seemingly regulatory in nature, that would be in accord with the Second Amendment. But we know that it runs afoul of the Second Amendment. When the Second Amendment was enacted, drug distribution was not unlawful. And so I think we've got to go back to when the Second Amendment was enacted, what were the types of offenses that were precluded? So burglary, sexual assault, murder, those sorts of things, violent offenses that were clearly offenses at the time, not things that Congress decided as the years progressed that would be offenses. Because otherwise, the Second Amendment is gutted by whatever the whim of Congress may be at whatever time in history they choose to enact a law, which again guts the Second Amendment. The Second Amendment at the time allowed the possession and the right to bear arms. At that time, drug distribution was not unlawful. And therefore, 924C is unconstitutional, both as applied to Mr. Underwood, and it's in totality. Chardonnay, you've got two minutes for a bottle. You could use them now, or you could save them. I'll save them. Thank you, Your Honor. Good morning. Good morning, Your Honor. My name is Tim Verhey. I represent the United States in this case, and I was one of the two prosecutors during the trial below. So let me just respond, unless the court has a different issue they want me to address, to what Ms. Chardonnay has presented to you here this morning. And what I hear her saying is that primarily the detention of Mr. Underwood was illegal. I think it's helpful to remember that reasonable suspicion is a fairly low bar. This case, this court has said on many occasions, including in the McAllister case, which is in our brief, that the reasonable suspicion bar is the low one. The facts here, I think, go far above that low bar because, as you know, Mr. Chapman called the Kalamazoo Police Department to say, I'm watching my stepson in the process of selling this pink firearm to somebody out in this Jeep out in front of my house. And Mr. Underwood's there, walking by, or whatever. He's in the neighborhood, right? Right. The police don't know anything about Mr. Underwood at this point. It's all a connection with a reasonable suspicion that he's selling a weapon, and Underwood is there, or whatever. Right. The facts do matter for a reasonable suspicion, of course, because it's a very fact-intensive inquiry. But if you recall what the facts are on the record, there was an officer that was surveilling the Jeep in the house, and he sees Underwood walk up to the Jeep, and he sees him lean into the back seat and do something behind the driver's side passenger seat. And then he hangs around there, and then Van Pelt comes over. So we've got three people in the car. Underwood walks up to the car and does something in the back seat, which is where that backpack was. And then he and Van Pelt walk away, and that's when the police move in. So the officer that stopped Mr. Underwood saw him walking along with Van Pelt. He said it was about 20 feet away from the Jeep by this time, but they had just left the Jeep. And Van Pelt's waving the money in the air. And so there's your reasonable suspicion that the man next to Van Pelt might be the one that bought the gun from Van Pelt. So that's why they stopped Underwood and Van Pelt. Now, Ms. Chartier says that he was searched three times before anything was ultimately found to arrest him. That is not what the record shows here. And as a matter of fact, the trial judge found, as a matter of fact, that he was only patted down one time. The officer first patted his front pocket and felt something that turned out to be money, but he concluded, well, that's not a gun. And then that's when the other officers who had proceeded onto the Jeep realized that they had a bunch of people armed with guns in the Jeep. And so Boglich, the officer that had Underwood, said, I stopped right there. I handcuffed Mr. Underwood and had him sit on the ground. Van Pelt was being handled by a different officer. What happened was, is that officer went over to the Jeep to try and help, you know, get the guns and the people out of that Jeep. And so Boglich is standing there with Van Pelt and Underwood, not doing anything, just keeping an eye on them while they're handcuffed until the Jeep is cleared. And then once it's done, at about six minutes, he stands Mr. Underwood up and he continues to pat his other three pockets. And when he got to his rear pocket, he said he felt, based on his training experience, what felt like a knotted baggie of some powdery substance, which he knew, based on his training experience, was likely to be a controlled substance. Your opposing counsel says that he lingered too long on that pocket, which can be a problem. Why does the evidence not show that he lingered too long? Well, again, Judge Yonker, our trial judge, found as a matter of fact that he did not do that. And that's subject, all these factual findings are subject to the clearly erroneous standard. So we have to deal with that. I don't think it was clearly erroneous. And you can see from the video that he, all he does is pat the pocket and then he pulls it out. And there it is, obviously, at least to a trained officer, what appears to be methamphetamine. So that, of course, translates into an arrest situation now where he can thoroughly search Mr. Underwood because he's going to place him under arrest for possession of narcotics. And so that leads to all the other facts that led to the charges here. So it is not the case, based on the record here, that there were three searches. There was only one search that was interrupted as it just got started, but then concluded once the Jeep got cleared. And that led to the discovery of the methamphetamine in Mr. Underwood's pocket, which then allowed him to be thoroughly searched incident to arrest. So there was not an illegal search here. This detention was very short in duration up until the time that there was probable cause for arrest. We're talking about approximately six minutes. That was eminently reasonable under the circumstances here where the officer was dealing with what the trial judge said was a fluid and developing situation involving multiple people with multiple guns. And the fact that other guns were found in the Jeep only heightened the level reasonable suspicion at that point as to Mr. Underwood because the police went from, well, maybe there's a gun that's being sold, as Mr. Chapman told the police. Now they have got a situation where there definitely are guns in the Jeep that Mr. Underwood had just left. I'd like you to talk about issue five, whether the trial court improperly admitted the photos and the text messages under rule 404B. We deal with it a lot. It's a pretty fine line between evidence of past drug dealing as evidence of specific intent to deal drugs now and whether it is prohibited. You did it before, you're likely to do it again, 404B evidence. Why is this not 404B evidence? Well, I think it was properly admitted under 404B. It was not admitted as pure propensity evidence because it dealt with two different issues that were hotly contested in this trial. One was Mr. Underwood had methamphetamine on July 9th, the date that was charged. Did he have it with the intent to distribute it? So the messages starting with those were a series of messages that began about three weeks before and led up to about the day before July 9th that clearly demonstrated that he was talking to his drug customers about selling methamphetamine and he was doing it on Maple Street because one of the text messages said meet me on Maple. So that gave the jury evidence that it should have had and should have had and did have to decide the issue. Did he just have methamphetamine on him for no purpose or was he selling it? A good test for us that draws that distinction between evidence of past drug dealing that should and should not be admissible. What test do you use? What test do you argue for in making that discernment? Well, if this answers your question, what we said we wanted to introduce it for and the judge accepted was this was linked to intent, which is a proper purpose under 404B that specifically helped the jury decide on July 9th why did Underwood have the methamphetamine? Did he just have it for personal use or was he selling it? And so this was powerful evidence that he was there to sell it because those messages leading up to his arrest on July 9th showed that he engaged in drug trafficking with that drug on July 9th. So that's why, as we cite in our brief, this court has on a number of occasions allowed past communications involving drug trafficking to be introduced for that purpose under Rule 404B because it goes to intent, which is one of those issues that's inherently difficult to prove through direct evidence, but it's something that the jury can extrapolate from to draw that conclusion. So the same thing is true, I think, for the photographs showing Underwood with the gun and the cash that were on his phone because if you recall, we called a drug trafficking expert to help educate the jury about what do drug trafficking tools do they have when they sell drugs. That's something that the average juror is not going to know. And so the drug trafficking expert says you typically see drug dealers carry around large amounts of cash. They usually have a cell telephone because that's how they communicate with their suppliers and their customers. They often have guns because of the security risks that go along with drug trafficking. And they often have drugs. They don't always keep them, their entire supply on their person, but they'll go and carry little amounts here and there as they're selling drugs. Was there a limited instruction given as to this? There was, Your Honor. Let me see if I can tell you exactly. There you go. If you look at page ID 3790, you'll see that the trial judge gave a limiting instruction on the 404B evidence. So it was tailored only to two issues, intent and to identify who it was that bought the gun on July 9th for Mr. Van Pelt because he clearly sold it to somebody. He didn't have the gun anymore and he had cash in his hand. Underwood is the only person that day that had cash to be able to make this transaction. Nobody else in the car had any cash on them. And that helped the jury identify that Underwood was the person that bought the gun because as a drug trafficker on July 9th, he would be the person that would have need of a gun even though it's stolen and even though it's you know, it's something that probably you wouldn't have for any other reason. But as a drug trafficker, he needed to have a gun and if there's one available, he could buy it. So that's where the 404B evidence came in and I think that was properly admitted. Is there a problem with relying on really similar methodology that would end up making this fall into the propensity category as opposed to the intent category? If I'm understanding your question, are you saying if it's not tied to intent, it's just propensity evidence? No. How do you make that dividing line between evidence of drug dealing so that it is relevant to intent as opposed to simply evidence, you did it once, you're going to do it again, which is prescribed propensity? I think it's a hard test to articulate. How would you suggest it be articulated in a way that makes a fair dividing line so that we are drawing that distinction that prevents it falling into propensity? This is particularly a drug dealing problem. It is. I think we're at the point where we've done the best we can and the drafters of 404B have done the best that can be done under the circumstances, which basically says you have to tie it to one of these permissible things like intent or motive or identity, and then you give a limiting instruction to the jury that says, and don't use it for any other purpose. And as you know, juries are presumed to follow jury instructions and there's nothing... You're saying it's got to be a totality of the situation's look by the district judge who's hearing the witnesses. Right. Isn't there also a balancing whether the probative value weighs its prejudicial effect? There is, and Judge Yonker did that as well. He said it was... Kind of an ad hoc determination, I think. How important is this? How prejudicial it is? Does it go to an issue, a matter at issue in the case? Now, I see my time's up here almost, but let me... On that issue, can I leave you with this thought too, which is even assuming the 404B evidence was improperly admitted, this is all subject to harmless error review as just part of the evidence against the defendant. And we've dealt with the whole section in our brief about how much evidence there was to convict Mr. Underwood of all the even putting this aside. So if you do ultimately conclude that this was improperly admitted, which of course we dispute, this does not rise to the level of harmful error. It's subject to harmless error. Do you have any comment on the 924C arguments? Most of the cases have to do with violence and this is a drug case. Oh, only to echo what you've already said, which is the Supreme Court has made it pretty clear, I think, in its decisions that the Second Amendment is kind of siloed into gun possession for lawful purposes. It's never... In the history of our country and even in England, it's never been... It's never been allowed for harmful purposes or unlawful purposes. And clearly, drug trafficking is a harmful, illegal purpose. And of course, 924C puts those together. It's not just having a gun, it's having a gun in furtherance of this dangerous behavior that even the Williams case that was recently decided, identified drug trafficking is one of these harmful crimes that ought to be prohibited. So, I would just leave it at that. Any further questions? All right. Thank you, counsel. Thank you, your honor. Two minutes rebuttal. Thank you. I do agree with Mr. Verhey that facts do matter. So, I would just like to point out that the officer who testified at trial, who said he saw Mr. Underwood lean into the vehicle and do something, had to admit that in his report, he did not say that. He said he saw Mr. Underwood look in the backseat of the car, but he did not see his hands or his arms moving. He did not see him get into the vehicle. And that is a big distinction that he was impeached with at trial. The reason why other individuals in the car may not have had any cash is they may have already purchased the firearm and given it to Mr. Van Pelt. So, the fact that they didn't have any cash doesn't mean that they couldn't in the minutes prior to the police arriving and coming up on the scene. As it relates to the other act evidence, I think, quite frankly, the court can do better. I think the drafters of the rule can do better. It comes in so frequently in drug cases. Someone will say, not just even a prior conviction, Mr. Underwood had no prior conviction. There's no substantially similar test, quite frankly, that the court used in this case. And that's why it was so harmful to Mr. Underwood. He wasn't a felon. So, the fact that he had a gun in a photograph is of no import to the jury. That never should have been... So, this court articulated, in our brief, we talk about Caldwell from the Third Circuit. But this court has articulated, I believe, in both Jenkins and Johnson. And in Johnson, it said, when jurors hear that a defendant has on earlier occasions committed essentially the same crime for which he's on trial, that information has a powerful and prejudicial impact. And it does. And that's why everyone should proceed so cautiously with this, with text on other occasions. This was July 9th. And so, if the court is looking, is this substantially similar and identical, with all due respect to the trial court, it ignored the differences. There were no text messages that day about drug dealing whatsoever. So, even if we assume that Mr. Underwood engaged in text message exchanges on multiple other days about drug dealing, there were none that day. But the government's argument was that he was possessing with intent to deliver that day. But there's no text messages, which makes the other text messages extremely prejudicial. The fact that he had a gun, potentially lawfully, he's not a felon on another date is of no import to this date, where he supposedly constructively possessed the pink firearm that he wasn't even linked to on that day. And the fact that he had large sums of money, quite frankly, so what? It is of no merit. It is extremely prejudicial for a jury to hear this on a case that was extremely circumstantial, with essentially no direct evidence whatsoever, pointing to Mr. Underwood. We articulated some other cases in the brief, but I think that... Anything further, Judge? Okay. All right. Thank you, Your Honor. Thank you so much. I see that you're appointed pursuant to the Criminal Justice Act. Yes, sir. Thank you very much for taking the case. Thank you.